IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| KELLEY PHELPS,       ) | |
| ) | |
| Plaintiff,       ) | |
| ) | |
| v.       ) | Civil Action No. 3:21-cv-00682 |
| ) | |
| CPI SECURITY SYSTEMS, INC. and       ) | |
| KENNETH GILL,       ) | |
| ) | |
| Defendants.       ) | |
| ) | |

**EXHIBIT A**

**TO**

**NOTICE OF REMVOAL**

Summons and Complaint

# STATE OF NORTH CAROLINA

_____Mecklenburg_____ County

*File No.* 21 CVS 18485

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Kelley Phelps<br><br>*Address*<br>1016 Long Creek Road<br><br>*City, State, Zip*<br>Kings Mountain, NC 28086 | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| **VERSUS** | G.S. 1A-1, Rules 3 and 4 |
| *Name Of Defendant(s)*<br>CPI Security Systems, Inc. and Kenneth Gill | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1*<br>CPI Security Systems, Inc.<br>c/o Eric Schachner<br>4300 Sandy Porter Road<br>Charlotte, NC 28273-3244 | *Name And Address Of Defendant 2*<br>Kenneth Gill<br>c/o CPI Security Systems, Inc.<br>4300 Sandy Porter Road<br>Charlotte, NC 28273-3244 |
|---|---|

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| | |
|---|---|
| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*<br>Nina Pirrotti, Esq.<br>Garrison, Levin-Epstein, Fitzgerald & Pirrotti, P.C.<br>405 Orange Street<br>New Haven          CT          06511 | *Date Issued*<br>11-17-2021          *Time* 2:00  ☐ AM  ☒ PM |
| | *Signature*<br><br>☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

| | |
|---|---|
| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement*          *Time*  ☐ AM  ☐ PM |
| | *Signature*<br><br>☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

| | **RETURN OF SERVICE** | |
|---|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid<br>$ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

FILED

Mecklenburg **County**

File No. 21 cvs 18485

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name And Address Of Plaintiff 1* | |
| Kelley Phelps | 2021 NOV 17 PM 1: 58 |
| 1016 Long Creek Road | |
| Kings Mountain, NC 28086 | MECKLENBURG CO. C S C |
| | BY |

**GENERAL
CIVIL ACTION COVER SHEET**

☒ INITIAL FILING    ☐ SUBSEQUENT FILING

*Name And Address Of Plaintiff 2*

Rule 5(b) of the General Rules of Practice for the Superior and District Courts

## VERSUS

*Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)*

| | |
|---|---|
| *Name And Address Of Defendant 1* | Nina Pirrotti |
| CPI Security Systems, Inc. | 405 Orange Street |
| 4300 Sandy Porter Road | New Haven, CT 06511 |
| Charlotte, NC 28273-3244 | |

| *Summons Submitted* | *Telephone No.* | *Cellular Telephone No.* |
|---|---|---|
| ☒ Yes ☐ No | 203-477-4255 | 917-613-0199 |

| | *NC Attorney Bar No.* | *Attorney Email Address* |
|---|---|---|
| *Name And Address Of Defendant 2* | 53232 | npirrotti@garrisonlaw.com |
| Kenneth Gill | | |
| c/o CPI Security Systems, Inc. | ☒ Initial Appearance in Case ☐ Change of Address |
| 4300 Sandy Porter Road | |
| Charlotte, NC 28273-3244 | *Name Of Firm* Garrison, Levin-Epstein, Fitzgerald and Pirrotti | *Fax No.* 203-776-3965 |

| *Summons Submitted* | *Counsel For* |
|---|---|
| ☒ Yes ☐ No | ☒ All Plaintiffs ☐ All Defendants ☐ Only: *(list party(ies) represented)* |

☒ Jury Demanded In Pleading    ☐ Complex Litigation    ☐ Stipulate to Arbitration

### TYPE OF PLEADING

*(check all that apply)*

| | |
|---|---|
| ☐ Amend (AMND) | ☐ Failure To State A Claim (FASC) |
| ☐ Amended Answer/Reply (AMND-Response) | ☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR) |
| ☐ Amended Complaint (AMND) | ☐ Improper Venue/Division (IMVN) |
| ☐ Assess Costs (COST) | ☐ Including Attorney's Fees (ATTY) |
| ☐ Answer/Reply (ANSW-Response) *(see Note)* | ☐ Intervene (INTR) |
| ☐ Change Venue (CHVN) | ☐ Interplead (OTHR) |
| ☒ Complaint (COMP) | ☐ Lack Of Jurisdiction (Person) (LJPN) |
| ☐ Confession Of Judgment (CNFJ) | ☐ Lack Of Jurisdiction (Subject Matter) (LJSM) |
| ☐ Consent Order (CONS) | ☐ Modification Of Child Support In IV-D Actions (MSUP) |
| ☐ Consolidate (CNSL) | ☐ Notice Of Dismissal With Or Without Prejudice (VOLD) |
| ☐ Contempt (CNTP) | ☐ Petition To Sue As Indigent (OTHR) |
| ☐ Continue (CNTN) | ☐ Rule 12 Motion In Lieu Of Answer (MDLA) |
| ☐ Compel (CMPL) | ☐ Sanctions (SANC) |
| ☐ Counterclaim (CTCL) *Assess Court Costs* | ☐ Set Aside (OTHR) |
| ☐ Crossclaim *(list on back)* (CRSS) *Assess Court Costs* | ☐ Show Cause (SHOW) |
| ☐ Dismiss (DISM) *Assess Court Costs* | ☐ Transfer (TRFR) |
| ☐ Exempt/Waive Mediation (EXMD) | ☐ Third Party Complaint *(list Third Party Defendants on back)* (TPCL) |
| ☐ Extend Statute Of Limitations, Rule 9 (ESOL) | ☐ Vacate/Modify Judgment (VCMD) |
| ☐ Extend Time For Complaint (EXCO) | ☐ Withdraw As Counsel (WDCN) |
| ☐ Failure To Join Necessary Party (FJNP) | ☐ Other *(specify and list each separately)* |

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

Case 3:21-cv-00682-FDW-DSC   Document 1-1   Filed 12/30/21   Page 4 of 23

| | **CLAIMS FOR RELIEF** | |
|---|---|---|

☐ Administrative Appeal (ADMA)
☐ Appointment Of Receiver (APRC)
☐ Attachment/Garnishment (ATTC)
☐ Claim And Delivery (CLMD)
☐ Collection On Account (ACCT)
☐ Condemnation (CNDM)
☐ Contract (CNTR)
☐ Discovery Scheduling Order (DSCH)
☐ Injunction (INJU)

☐ Limited Driving Privilege - Out-Of-State Convictions (PLDP)
☐ Medical Malpractice (MDML)
☐ Minor Settlement (MSTL)
☐ Money Owed (MNYO)
☐ Negligence - Motor Vehicle (MVNG)
☐ Negligence - Other (NEGO)
☐ Motor Vehicle Lien G.S. Chapter 44A (MVLN)
☐ Possession Of Personal Property (POPP)

☐ Product Liability (PROD)
☐ Real Property (RLPR)
☐ Specific Performance (SPPR)
☒ Other *(specify and list each separately)*
Discrimination and retaliation in violation of 42 U.S.C. sec. 2000e et seq and 42 U.S.C. sec. 1981; and common law wrongful discharge in violation of public policy

| *Date* | *Signature Of Attorney/Party* |
|---|---|

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ **Additional Plaintiff(s)** |
|---|---|
| | |
| | |
| | |
| | |
| | |

| No. | ☐ **Additional Defendant(s)**      ☐ **Third Party Defendant(s)** | **Summons Submitted** |
|---|---|---|
| | | ☐ Yes  ☐ No |
| | | ☐ Yes  ☐ No |
| | | ☐ Yes  ☐ No |
| | | ☐ Yes  ☐ No |
| | | ☐ Yes  ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*



*Defendant(s) Against Whom Crossclaim Asserted*

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 18465

---

KELLEY PHELPS,

        Plaintiff,

v.

CPI SECURITY SYSTEMS, INC. and
KENNETH GILL,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:

---

## COMPLAINT

### I.    INTRODUCTION

    1.    The Founder and Chief Executive Officer of CPI Security Systems, Inc., Kenneth Gill, has a history of racist statements and practices in the workplace. This racism was not widely known outside of CPI, but in the late spring 2020, it gained widespread attention when, in response to a call for action after the murder of George Floyd, Mr. Gill encouraged community members to "spend [their] time in a more productive way," adding that a "better use of time" would be "to focus on the black-on-black crime."

    2.    Media reports of Mr. Gill's statements prompted widespread condemnation and boycotts of CPI, and major corporate customers of CPI – including the Charlotte Hornets, Carolina Panthers, Bojangles, and the YMCA – dropped CPI as a vendor. Numerous CPI employees, meanwhile, staged a walkout and threatened to quit *en masse*. Mr. Gill put on a public show of understanding and contrition, but behind the scenes he dismissively claimed that the story would just "blow over."

3.  As a twenty-plus-year CPI veteran, the head of CPI's customer care center, and CPI's highest ranking Black employee, Kelley Phelps found herself at the center of this fiasco. She did everything she could to persuade customers and employees to remain loyal to CPI. Ultimately, however, she became so disturbed by Mr. Gill's dismissive response – which she had come to believe reflected a deep-seated culture of racism at CPI – that she tendered her notice of resignation.

4.  CPI rejected her resignation and urged her to reconsider her decision. After a period of reflection, Ms. Phelps agreed, rescinding her resignation, and returning to work at her usual full-throttle pace.

5.  Soon thereafter, however, CPI asked Ms. Phelps to share her concerns about the racial culture at CPI with company investigators. Ms. Phelps agreed, reporting the failure of CPI's leaders to address racist practices at the company and suggesting ways for the company to create a more racially inclusive work environment. Within days of that protected activity, the company abruptly announced her termination to a shocked Ms. Phelps and tearful co-workers, covering up its retaliatory action under the deception that Ms. Phelps had never rescinded her resignation and had chosen to leave.

6.  Accordingly, Ms. Phelps brings claims against CPI for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. In addition, Kelley Phelps asserts claims under North Carolina common law for wrongful discharge in violation of public policy.

7.  Ms. Phelps demands a jury trial on all claims so triable.

2

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction with respect to all claims asserted herein in that the plaintiff asserts claims under the common law of North Carolina and in that this Court has concurrent jurisdiction over all federal claims asserted.

## III. PARTIES

9. The plaintiff, Kelley Phelps, is a Black woman who resides in Kings Mountain, North Carolina.

10. The defendant, CPI Security Systems, Inc. (hereinafter "CPI"), is a corporation incorporated under the laws of North Carolina and with its principal place of business in Charlotte, Mecklenburg County, North Carolina. At all times relevant to this Complaint, CPI has been in the business of providing residential and commercial security systems and services.

11. CPI employs 50 or more employees in North Carolina.

12. At all relevant times mentioned herein, CPI was Ms. Phelps's employer within the meaning of Title VII.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. The plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation.

14. The EEOC complaint was filed in a timely manner insofar as it was filed within 180 days of the defendant's last discriminatory and retaliatory acts against the plaintiff.

15. The plaintiff received a Right to Sue Letter from the EEOC, dated September 14, 2021.

16. The plaintiff filed this Complaint within 90 days of her receipt of the Right to Sue Letter from the EEOC.

3

V.    **STATEMENT OF FACTS**

    A.    **Time and Again During Her Twenty-Year Tenure, Ms. Phelps Demonstrates Her Commitment to CPI.**

17.    Ms. Phelps was employed by CPI for over two decades.

18.    Ms. Phelps held various positions during her lengthy tenure with CPI, and throughout her employment her performance was consistently outstanding.

19.    Ms. Phelps received CPI's Presidential Leadership Conference award three times, in 2004, 2007 and 2016. The award is given only to exceptional CPI employees who exceed their annual goals.

20.    Over many years, Ms. Phelps watched as white male employees, including one she personally trained, rose through the ranks above her and other Black employees. It was not until 2016 that Ms. Phelps was finally elevated to the level of Customer Care Call Center Director. In that role, which she held until her termination, she was responsible for overseeing 50-60 employees, the majority of whom were Black and Brown.

21.    As Call Center Director, Ms. Phelps worked under the Vice President of Customer Care, John Shocknesse.

22.    Ms. Phelps's thoughtful and inspirational leadership and management led to the Customer Care Call Center employees receiving high customer satisfaction scores, and CPI revenues increased due to successful upselling and customer retention.

    B.    **CPI Engages in Racist Practices Against Its Black and Brown Customers and Employees and Tokenizes Ms. Phelps.**

23.    CPI had engaged in discriminatory practices toward its Black customers and employees for many years prior to the events of late Spring 2020.

4

24.     Upon information and belief, CPI had a longstanding practice of running credit checks on prospective customers before it would send field sales consultants out to certain geographic areas – such as West Charlotte, parts of Henderson, Durham, and Greensboro, and Oxford – that had disproportionately larger Black populations.

25.     CPI's corporate policies historically allowed its customers to specify the race of their technicians. Accordingly, when white CPI customers asked that only a white technician come to their home, CPI would comply with that request. On information and belief, the total compensation CPI field technicians could earn was tied to the number of calls to which they were assigned, so this policy directly harmed CPI's Black technicians.

26.     After Ms. Phelps became Call Center Director, she would instruct her employees to reject such requests, but there was no Standard Operating Procedure at CPI directing employees that they could not comply and, upon information and belief, some of these requests continued to be honored. Indeed, during Summer 2020, CEO Kenneth Gill expressly turned down Ms. Phelps's request to create such a policy, a passive but powerful expression of his support of CPI customers who insisted upon choosing the race of their tech.

27.     CPI's own Black employees fared no better.

28.     For example, Ms. Phelps's direct supervisor, Mr. Shocknesse, directed her not to hire employees who had locks, which of course is a hairstyle commonly understood as expressing Black culture. Mr. Shocknesse explained to Ms. Phelps that CPI CEO Gill wanted employees to have a certain "look," which excluded expressing Black ethnic and racial identity.

29.     Consistent with its practice of marginalizing its Black employees, CPI treated Ms. Phelps as a Black liaison, frequently sending her to communicate with Black CPI employees, regardless of whether those employees reported to her. For example, if a Black woman came to

5

work wearing a head wrap, Mr. Shocknesse would direct Ms. Phelps to ask the employee to remove it – even when the employee worked in a division of the Call Center that reported to a white manager.

30. Upon information and belief, CPI had a proverbial glass ceiling for its Black employees. Upon her promotion in 2016, Ms. Phelps became the first Black Director at CPI. In or about 2018, one other Black employee, Curtis Robertson, was promoted to Director. There were no Black employees above the Director level at the company until after the events of Summer 2020 when, upon information and belief, CPI finally included a Black person in its senior management team.

31. CPI also has a history of underpaying Ms. Phelps in comparison to her comparably situated white, male peers. After Ms. Phelps became a Call Center Director, CPI hired another Call Center Director – a white man named Dave Matters – and paid him approximately $60,000 per year more than Ms. Phelps, even though he had fewer responsibilities and less tenure with CPI than she.

## C. Following George Floyd's Murder, CEO Gill Dismisses Concerns About Racism and Reveals His Own Prejudices.

32. Although Ms. Phelps's concerns about race discrimination at CPI far predated the summer of 2020, the groundswell in the wake of George Floyd's murder on May 25 brought them to the fore.

33. Following Mr. Floyd's murder, a major CPI customer informed Ms. Phelps that two CPI employees were posting racist memes and comments on social media. One post, for example, referenced Black protestors and said, "Bet they don't burn down the food stamp office." Another meme – referring to the COVID-19 stimulus checks – stated, "$500 a kid?

6

Trump is the best baby daddy some of you hoes ever had." A third said, "I coughed, and this Chinese lady moved away from me. Bitch you started it."

34. As Call Center Director responsible for customer retention, Ms. Phelps approached Mr. Gill directly about these racist comments. In addition to sharing the concerns articulated by many CPI customers, Ms. Phelps also told Mr. Gill about her own personal perspective, including the history of violent racism that her family had faced in the South.

35. Mr. Gill did not condemn the content of the social media posts or promise disciplinary action against the employees involved, nor did he acknowledge the continuing experiences of racism Ms. Phelps described. Instead, Mr. Gill dismissively stated that Ms. Phelps and Black people generally had "come a long way." He then criticized President Obama as the "worst president" for failing to "teach black men not to run out on their children" and mocked a Black Charlotte City Council member, Braxton Winston, for trying to address protestors' concerns about police violence against Black people "instead of focusing on real problems like crime."

### D. Mr. Gill's Racist Email Becomes Public, Sparking a Maelstrom Around CPI, Which In Turn Leans Heavily on Ms. Phelps to Quell the Outrage.

36. On June 5, 2020, CEO Ken Gill replied to an email sent to Charlotte government officials and community members by Charlotte non-profit director (and former CPI employee) Jorge Millares criticizing the Charlotte-Mecklenburg Police Department's violent response to peaceful protests over the murder of Mr. Floyd.

37. Mr. Gill's email embraced racist stereotypes about Black people and dismissed concerns about racist policing with the following statement:

> *Please spend time in a more productive way. . . A better use of time, would be to focus on the black on black crime and senseless killing of our young men by other young men. Have a great day.*

7

38.     Mr. Millares made Mr. Gill's response public, and multiple television and news outlets picked up on it immediately.

39.     While Ms. Phelps had been hurt by Mr. Gill's racist remarks to her just one week earlier, reading his derogatory comments about Black people in a public forum hit her hard.

40.     Ms. Phelps was not alone.  Business and residential customers rushed to cancel their relationships with CPI.  Call Center phones rang non-stop as many customers sought to cancel their service contracts.

41.     As Call Center Director, Ms. Phelps found herself not only attempting to salvage these customer relationships, but also trying to manage a large team of employees who were shocked and angered by the words of their own CEO.

42.     Mr. Gill came to the Call Room floor to try to explain away his email. Unconvinced by his explanation, several dozen CPI employees staged a walkout.

43.     Thereafter, for the first time in Ms. Phelps's lengthy tenure as a Director, CPI finally included her in senior management team meetings, which had been convened to address the fall-out from Mr. Gill's email to Mr. Millares.

44.     During the meetings, the all-white leadership treated Ms. Phelps as the token "Black expert," and sought her advice on how to deal with the racial issues Mr. Gill's statement had awakened.  Even then, white senior managers continued to exclude Ms. Phelps from broader business matters, summoning her only for parts of the meetings, after they had already discussed and put together proposals to address negative publicity or customer discontent.

45.     The senior managers demonstrated the degree of their racial insensitivity when they asked Ms. Phelps to comment upon a draft article CPI intended to send to the Charlotte Observer.  To Ms. Phelps's shock, the article used the term "colored people" to refer to Black

8

Americans. In this and similar meetings, she found herself in the excruciating position of having to advise senior managers about how to respectfully communicate about race.

46.     During this time, senior leaders continued tokenizing Ms. Phelps by requiring her to listen and respond to voice mail messages, emails, and letters addressed to CEO Gill from Black customers and members of the public.

47.     While calls seeking to terminate service agreements fell within Ms. Phelps's Call Center responsibilities, many of these calls were directed to Mr. Gill himself and were not within her ambit. Even more troubling, by insisting that Ms. Phelps field these complaints, CPI put her in the untenable position of defending CEO Gill for language she found deeply offensive.

48.     As June progressed, Ms. Phelps learned that Mr. Gill's recent racist comments were far from aberrant. For example, another CPI employee told her that, prior to Summer 2020, Mr. Gill had called out a deeply tanned manager at a meeting, remarking:

*If you get any darker, we'll have to seat you at the back of the bus.*

**E. Mr. Gill: "This is the Next Story, It'll Blow Over."**

49.     In the wake of Mr. Gill's email, Black CPI employees began advocating for the company to create a Diversity, Equity and Inclusion Committee. Ms. Phelps expressed her support for this proposal, including with CPI's senior leaders.

50.     In late June 2020, Ms. Phelps had another conversation with Mr. Gill about the public response to his email. This time, however, Mr. Gill openly dismissed the public outcry, saying:

*This is just the next story. It'll blow over.*

9

**F.** **Ms. Phelps Provides Notice of Her Intent to Resign. CPI Rejects Her Notice and Asks Her to Reconsider. She Tells CPI She Will Stay.**

51.     On July 6, 2020, exhausted with CPI's racist culture, leadership's unwillingness to take meaningful steps to change it, and the pressure she felt to defend Mr. Gill to employees and the public, Ms. Phelps provided Mr. Shocknesse with written notice of her resignation, effective August 21, 2020.   The letter referenced Ms. Phelps's motivation for her notice:

"I . . . wish you and the leadership team success as you *work to build culture that respects and honors all internal and external stakeholders*."

52.     CPI did not accept Ms. Phelps's notice of resignation.  Instead, Mr. Shocknesse, Chief People Office Jennifer Snellgrove, and Chief Operating Officer Brent Uhl immediately began working to change her mind.

53.     Mr. Shocknesse pleaded with Ms. Phelps not to leave, told her that her resignation would be "catastrophic" and that she was the "heart and soul of the company," and asked what he could do to convince her to stay.

54.     Later that week, Ms. Snellgrove and Mr. Uhl offered Ms. Phelps a week of paid leave so she could rest and return to work refreshed.  Ms. Snellgrove reassured her that she also felt "conflicted" about recent events and that senior management was taking steps to address Mr. Gill's communications.

55.     Ms. Phelps agreed to take the paid leave starting July 13 and to use that time to reflect.

56.     Before Ms. Phelps went out on leave, Mr. Shocknesse gave her a gift from Mr. Gill: two bottles of fine wine and devotional material, along with his wish that she "had time to relax and decompress" during her upcoming paid leave.

10

57.     Leaving her team members during this difficult time was painful for Ms. Phelps. Her team members meant everything to her. She had attended funerals of their loved ones, visited them in the hospital, supported them in their personal challenges, and celebrated their successes. She strove every day to make sure each of her subordinates felt valued and supported and to be the best possible role model for her team.

58.     During her week of leave, even while she tried to take some time to relax and reflect, Ms. Phelps continued to keep in touch with her team to ensure they had the support and guidance they needed to function.

59.     On July 20, 2020, Ms. Phelps returned to work. Upon her return, her team members greeted her enthusiastically. They also described continued challenges in fielding calls from customers who wished to cancel their relationship with CPI because of Mr. Gill's comments.

60.      Many team members still appeared to have one foot out the door. Ms. Phelps encouraged them to hang in there and not to quit. She assured them that they would get through this together and be part of the change.

61.     That first week back, Ms. Phelps met with former Charlotte Police Chief Kerr Putney, whom CPI had hired as its new Community and Government Relations consultant after Mr. Gill's remarks went viral. Mr. Putney appeared to be supportive of changes to make CPI a more inclusive environment, and Ms. Phelps was encouraged by their conversation.

62.     By the end of her first week back at work, Ms. Phelps had reached the decision to rescind her resignation and stay at CPI.

63.     Ms. Phelps's boss, Mr. Shocknesse, was out on leave from July 20 through July 24. When he returned to the office on July 27, Ms. Phelps met with him to inform him of

11

her decision and that she was committed to her employment with CPI. She explained that, given that she had been encouraging her employees who wanted to leave to remain, she felt she needed to make a commitment to stay herself and be part of the change. Mr. Shocknesse expressed his pleasure with Ms. Phelps's decision and stated that CPI had approved a significant salary increase for her, effective immediately.

### G.   When asked by CPI's Investigators, Ms. Phelps Candidly Complains About CPI's Senior Leadership's Failure to Address Racism.

64.    On or around July 28, Mr. Putney and an outside human relations consultant, Jennifer Davis, arranged to meet with Ms. Phelps to discuss CPI's racial culture. Both Mr. Putney and Ms. Davis expressly reassured Ms. Phelps several times that the conversation would be "confidential."

65.    Trusting that assurance, Ms. Phelps presented in detail her many observations and concerns regarding racist comments and behaviors at the company over the previous weeks and years, including how troubled she was by her recent conversations with Mr. Gill. She repeated her support for a Diversity, Equity and Inclusion Committee and inquired about whether senior management would be provided with racial equity training.

66.    Mr. Putney asked Ms. Phelps for specific feedback about how CPI's executives were handling the racial issues at the company. Asked how she would rate CPI's senior leaders on issues of diversity, equity, and inclusion, Ms. Phelps responded that she would give Mr. Gill, Ms. Snellgrove, and Mr. Shocknesse low scores.

### H.   Senior Leadership Learns of Ms. Phelps's July 28 Complaints and Freezes Her Out.

67.    After her meeting with Mr. Putney and Ms. Davis, Ms. Phelps noticed a distinct shift in how CPI's senior management treated her. Instead of friendly smiles and conversation, which had been the norm, senior managers were cold and avoided talking to her. Mr. Gill simply

12

stopped interacting with Ms. Phelps altogether and no longer invited her to senior management meetings.

68.     It became apparent to Ms. Phelps that, despite the promise of "confidentiality," the concerns she had expressed in the July 28 meeting had been shared with the executive team, including Mr. Gill.

69.     Ms. Phelps's suspicion was confirmed during the week of August 10 when she approached Mr. Shocknesse, who had been particularly cold to her after the July 28 meeting. She asked him why he was treating her differently and for his thoughts about her intentions to remain employed by CPI. He said, "Of course I want you here, but we're concerned about your level of commitment."

70.     Mr. Shocknesse also said that Ms. Phelps's family members "must be wondering why you're still working for a company they consider racist." She responded: "You have never in the past questioned my commitment. I've been supporting my employees, and I want to continue to be here."

71.     Ms. Phelps then expressed her concern about how Mr. Gill and other managers perceived her, given this significant misperception about her "commitment." Mr. Shocknesse indicated Ms. Phelps should speak with Mr. Uhl. Mr. Shocknesse also informed Ms. Phelps that CPI had rejected the creation of a Diversity, Equity and Inclusion Committee because it was "not needed."

I.     **Mr. Gill Personally Decides to Terminate Ms. Phelps.**

72.     On or about August 13, Ms. Phelps met with Mr. Uhl. Mr. Uhl told Ms. Phelps that he had heard about the "low score" she had given Mr. Gill and other senior CPI executives during her July 28 meeting with Mr. Putney and Ms. Davis. Mr. Uhl also said he was aware of her concerns about the company culture.

13

73.     Ms. Phelps reiterated her plan to stay at CPI and requested a meeting with Mr. Gill to confirm that she had his full support. Mr. Uhl told her he would "get [her] in front of Ken" for a meeting the next day.

74.     Mr. Gill's mother passed away the following day, and Mr. Uhl informed Ms. Phelps that she would meet Mr. Gill the following week. No such meeting ever took place.

75.     Instead, on August 18, CPI terminated Ms. Phelps. The termination message was delivered by Mr. Shocknesse and Mr. Uhl, who informed her, in substance, "Ken had thought about this, and we think it's a good idea for you to leave the company tomorrow."

76.     Mr. Uhl admitted that Mr. Putney had disclosed Ms. Phelps's complaints about racism at CPI not only to CPI's senior managers, but to Mr. Gill directly. He said that Mr. Gill himself had made the decision to terminate Ms. Phelps.

77.     Ms. Phelps started to sob.

78.     Mr. Shocknesse and Mr. Uhl escorted Ms. Phelps into Ms. Snellgrove's office where, to her surprise, Mr. Putney was also waiting. She asked Ms. Snellgrove what Mr. Putney was doing there, and she replied that he was a "witness." Ms. Snellgrove handed Ms. Phelps paperwork, including a proposed severance package.

79.     Several months after Ms. Phelps' termination, the company replaced her with an external hire, Thomas Cunningham. Mr. Cunningham is white.

14

## VI. LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF AGAINST CPI:
### RACE DISCRIMINATION,
### IN VIOLATION OF 42 U.S.C. § 2000 et seq.

80.     Sections I through V above are incorporated herein as if fully pled in this Count.

81.     Ms. Phelps's race was a motivating factor in CPI's decision to terminate her.

82.     CPI's conduct in this regard was willful and/or in reckless disregard for Ms. Phelps' right to be free from discrimination.

83.     As a result of CPI's conduct, Ms. Phelps suffered damages.

### SECOND CLAIM FOR RELIEF AGAINST CPI: RETALIATION
### IN VIOLATION OF 42 U.S.C. § 2000 et seq.

84.     Sections I through V above are incorporated herein as if fully pled in this Count.

85.     Ms. Phelps's participation in protected activity was a motivating factor in CPI's decision to terminate her.

86.     CPI's conduct in this regard was willful and/or in reckless disregard for Ms. Phelps's right to be free from retaliation.

87.     As a result of CPI's conduct, Ms. Phelps suffered damages.

### THIRD CLAIM FOR RELIEF AGAINST CPI:
### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

88.     Sections I through V above are incorporated herein as if fully pled in this Count.

89.     CPI terminated Ms. Phelps's employment because of her race.

90.     CPI's conduct in this regard was willful and/or in reckless disregard for Ms. Phelps's right to be free from discrimination.

91.     As a result of CPI's conduct, Ms. Phelps suffered damages.

## FOURTH CLAIM FOR RELIEF AGAINST KENNTH GILL:
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

92.     Sections I through V above are incorporated herein as if fully pled in this Count.

93.     Kenneth Gill terminated Ms. Phelps's employment because of her race.

94.     Mr. Gill's conduct in this regard was willful and/or in reckless disregard for Ms.

Phelps' right to be free from discrimination.

95.     As a result of Mr. Gill's conduct, Ms. Phelps suffered damages.

## FIFTH CLAIM FOR RELIEF AGAINST CPI
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

96.     Sections I through V above are incorporated herein as if fully pled in this Count.

97.     CPI terminated Ms. Phelps's employment in retaliation for her protected activity.

98.     CPI's conduct in this regard was willful and/or in reckless disregard for Ms.

Phelps' right to be free from retaliation.

99.     As a result of CPI's conduct, Ms. Phelps suffered damages.

## SIXTH CLAIM FOR RELIEF AGAINST KENNETH GILL
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

100.    Sections I through V above are incorporated herein as if fully pled in this Count.

101.    Kenneth Gill terminated Ms. Phelps's employment in retaliation for her protected

activity.

102.    Mr. Gill's conduct in this regard was willful and/or in reckless disregard for Ms.

Phelps's right to be free from retaliation.

103.    As a result of CPI's conduct, Ms. Phelps suffered damages.

## SEVENTH CLAIM FOR RELIEF AGAINST CPI:
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

104. Sections I through V above are incorporated herein as if fully pled in this Count.

105. It is an established public policy of the State of North Carolina to prohibit the practice of race discrimination in employment, as set out in N.C. Gen. Stat. § 143-422 *et seq*. It is further a violation of the public policy of North Carolina to discharge an employee because of her race or for her opposition to race discrimination in employment. N.C. Gen. Stat. § 143-422.1 *et seq*.

106. CPI wrongfully discharged Ms. Phelps in violation of North Carolina public policy.

107. As a result of CPI's actions, Ms. Phelps has incurred lost wages, employment benefits, and other compensation and other pecuniary losses, as well as personal injuries includes emotional difficulties, depression, loss of self-esteem, and other personal suffering, all in excess of $25,000.00.

108. CPI's actions were willful, deliberate, voluntary, and intentional, and in gross disregard for Ms. Phelps's rights.

**WHEREFORE**, Ms. Phelps respectfully requests that the Court grant judgment for her and that it order and award her the following relief against CPI:

1. An award of back pay, front pay, and other economic losses incurred, including bonuses, benefits, interest, and other consequential damages;

2. Compensatory damages for emotional distress, loss of reputation, and other non-economic damages;

3. Reasonable attorney's fees and costs;

4. Pre-judgment and post-judgment interest on her economic losses;

17

5.  Punitive damages; and

6.  Such other relief as may be just and equitable.

                        RESPECTFULLY SUBMITTED,
                        THE PLAINTIFF,
                        KELLEY PHELPS

By:     */s/ Nina T. Pirrotti*
                        Nina T. Pirrotti *(NC Bar No. 53232)*
                        Joshua R. Goodbaum *(ct28834) (pro hac*
                        *vice application pending)*
                        Elisabeth Lee *(ct30652)(pro hac vice*
                        *application pending)*

                        GARRISON, LEVIN-EPSTEIN
                            FITZGERALD & PIRROTTI, P.C.
                        405 Orange Street
                        New Haven, CT 06511
                        Tel.: (203) 777-4425 | Fax: (203) 776-3965
                        npirrotti@garrisonlaw.com

                                and

                        Faith Herndon
                        N.C. Bar No. 17975
                        LAW OFFICE OF FAITH HERNDON
                        115 E Main Street, Durham, NC 27701
                        Tel.: (919) 682-4994  Fax: (888) 641-9824
                        fh@faithlaw.net

18